# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | NO. 1:11-CR-27 |
| | § | |
| MARVIN MAURICE COTTON | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE ON THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Pending is the "Defendant's Motion for Suppression of Evidence" (Dkt. 36)[1], in which the Defendant requests suppression of all contraband seized and statements made during a traffic stop in Jefferson County, Texas on Interstate Highway 10 on February 18, 2011. The contraband seized consists of nearly 500 grams of crack cocaine found within the interior panel of the rental car the Defendant was driving. The Defendant seeks relief pursuant to Rule 41(f) of the Federal Rules of Criminal Procedure and the Fourth, Fifth, and Sixth Amendments to the United States Constitution. The United States filed a sealed response in opposition to the motion (Dkt. 39), and the undersigned magistrate judge heard oral argument on September 27, 2011. The undersigned finds the seizure and subsequent search of Cotton's vehicle was lawful for three reasons: 1. the seizure of Cotton's vehicle was justified because there was reasonable suspicion that he committed a traffic violation; 2. there was probable cause to search the vehicle; and 3. the search was conducted pursuant to Cotton's valid consent. Furthermore, the Defendant was properly advised of his Miranda rights, and accordingly, his oral statements made at the scene of the traffic stop should not be suppressed.

---

[1] This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law. United States v. Raddatz, 447 U.S. 667, 681-84 (1980); see also 28 U.S.C. § 636(b)(1)(B) and Local Rules for the Assignment of Duties to United States Magistrate Judge.

# I. DISCUSSION

The Fourth Amendment states that the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST., Amdt. 4. A seizure of a person has been identified as occurring at that point in time when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). Clearly, the stop and detention of Cotton was a "seizure" within the meaning of the Fourth Amendment. The question for this Court is whether the stop and the seizure were reasonable.

### A. **Facts of the Initial Stop**

On Friday, February 18, 2011, Sgt. Frank Fullbright of the Houston Police Department was conducting surveillance for an investigation involving a suspected narcotics trafficker staying at a Comfort Inn in Houston, Texas. During his surveillance, Sgt. Fullbright observed a man, later identified as Marvin Maurice Cotton (hereinafter "Cotton"), using a computer in the business center of the hotel lobby. Once Cotton left the business center, Sgt. Fullbright checked the computer and saw that Cotton was attempting to book a flight from Houston to Atlanta, Georgia set to depart four days later. Sgt. Fullbright then went to the parking lot to maintain surveillance on a Toyota Camry which was registered to the original suspect under surveillance. As he maintained surveillance, Sgt. Fullbright noticed Cotton and another man (later identified as John Thornton (hereinafter "Thornton")) exit the hotel lobby. The two men walked out to a black Mercury Grand Marquis with Oklahoma license plate 751-FCU in the hotel parking lot. Sgt. Fullbright ran a check of the Oklahoma license plate and discovered that the vehicle was owned by Enterprise Rent a Car. He contacted Enterprise and learned that the vehicle was rented by Cotton the day before near Hobby

Airport and was due to be returned in three days. Sgt. Fullbright next ran a criminal history check on Cotton and discovered he was a Georgia resident with prior convictions for trafficking crack cocaine. By the time the criminal history information was returned, Cotton and Thornton had left the hotel in the Mercury Grand Marquis; Sgt. Fullbright presumed the pair was driving east towards Georgia and contacted Lt. Tony Viator with the Jefferson County Sheriff's Office Highway Interdiction unit, which operates on Interstate Highway 10 east of Houston. Sgt. Fullbright relayed his observations of Cotton's "suspicious" behavior, that Cotton had prior drug trafficking criminal history, and the description of the vehicle to Lt. Viator.

At around 11:40 a.m., Lt. Viator was checking an abandoned vehicle on the right shoulder of the eastbound lane of Interstate 10. Lt. Viator drove a Chevrolet Tahoe with no identifying markings other than front and rear-mounted emergency lights. Only the rear lights were activated during Lt. Viator's check of the abandoned vehicle. The parties dispute how Lt. Viator's unmarked vehicle was positioned in relation to oncoming traffic, but the parties agree that he did have his rear-vehicle emergency lights activated.

While inspecting the abandoned vehicle, Lt. Viator observed Cotton's vehicle pass him traveling at 70 miles per hour, heading eastbound in the right hand lane of traffic (the lane closest to Lt. Viator's vehicle). Under Texas Transportation Code § 545.157, all vehicles are required to vacate the lane closest to an emergency vehicle or slow down to 20 miles per hour below the posted

speed limit when passing an emergency vehicle that has its emergency lights activated.[2] Consequently, Lt. Viator initiated a traffic stop.

### B. Legality of the Stop

Cotton claims that there was no probable cause or reasonable suspicion to stop his vehicle, and that the stop "amounted to nothing more than a pre-text stop on the part of the officer based on a racially motivated profile." Dkt. 35, p. 1. Under Fifth Circuit and Supreme Court case law, this argument fails.

The most frequently cited case against such arguments is Whren v. United States, 517 U.S. 806 (1996).[3] In Whren, the Court held that the constitutional reasonableness of traffic stops does

---

[2] As relevant here, section 545.157 provides:

(a) On approaching a stationary authorized emergency vehicle using visual signals that meet the requirements of Sections 547.305 and 547.702, an operator, unless otherwise directed by a police officer, shall:

   (1) vacate the lane closest to the emergency vehicle when driving on a highway with two or more lanes traveling in the direction of the emergency vehicle; or

   (2) slow to a speed not to exceed:

      (A) 20 miles per hour less than the posted speed limit when the posted speed limit is 25 miles per hour or more.

(b) A violation of this section is:

   (1) a misdemeanor punishable under Section 542.401.

[3] The facts of Whren are as follows: Plainclothes policemen patrolling a "high drug area" in an unmarked vehicle observed a truck driven by petitioner Brown waiting at a stop sign at an intersection for an unusually long time; the truck then turned suddenly, without signaling, and sped off at an "unreasonable" speed. The officers stopped the vehicle, to "warn the driver about traffic violations," and observed plastic bags of crack cocaine in petitioner Whren's hands after approaching the truck. Prior to trial on federal drug charges, Defendants moved for suppression of the evidence, arguing that the stop had not been justified by either a reasonable suspicion or probable cause to believe petitioners were engaged in illegal drug-dealing activity, and that the officers' traffic-violation ground for approaching the truck was pretextual. The Court held that the temporary detention of a motorist upon probable cause to believe that he has violated the traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective.

not depend on the actual motivations of the individual officers involved. Id. at 813. Whren held that regardless of what a "reasonable officer" would have done, the temporary detention of a motorist, who the police have probable cause to believe has committed a civil traffic violation, is consistent with Fourth Amendment's prohibition against unreasonable seizures. Id. at 813-14. Since Whren, the Court has reaffirmed this principle that the Fourth Amendment does not require an investigation into an officer's *actual* motive for making a traffic stop. Arkansas v. Sullivan, 532 U.S. 769, 771 (2001); Atwater v. City of Lago Vista, 532 U.S. 318, 363 (2001). Indeed, a traffic-violation arrest will not be rendered invalid by the fact that it was "a mere pretext for a narcotics search." United States v. Robinson, 414 U.S. 218, 221 n.1 (1973).

While courts will not examine a police officer's subjective motive for making a traffic stop, the traffic stop must nonetheless result from probable cause or reasonable suspicion to believe that the Defendant has at least violated some traffic regulation. Even a minor violation can justify a traffic stop. See, e.g. United States v. Zamora, 2011 WL 4953992, at *4 (5th Cir. October 19, 2011) (holding that a missing front license plate and cancelled rear license plate provides police with reasonable suspicion); United States v. Summers, 108 Fed. Appx. 192 (5th Cir. 2004) (holding that the district court did not err, in determining whether a traffic stop was justified, by believing the testimony of the arresting officer that he stopped the vehicle because of the driver's failure to signal before turning); United States v. Baird, 108 Fed. Appx. 893 (5th Cir. 2004) (holding that, under Texas law, a defendant's failure to use his turn signal gave police officers reasonable suspicion to stop the Defendant's vehicle); United States v. Granado, 302 F.3d 421 (5th Cir. 2002) (decision to stop an automobile is constitutional where police have probable cause to believe that a traffic violation has occurred). In these cases, the Fifth Circuit reached its result by applying the two-step

reasonable suspicion inquiry under Terry v. Ohio, 392 U.S. 1 (1968):

1) determine whether the officer's action was justified at its inception, and

2) determine whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.

United States v. Zamora, 2011 WL 4953992, at *4 (5th Cir. October 19, 2011).

Lt. Viator testified that he initially searched for Cotton's vehicle as a result of a tip from Sgt. Fullbright, for suspicion of drug trafficking activity. After forty-five minutes, Lt. Viator relinquished his search for Cotton and went to check on an abandoned vehicle. At the hearing, Lt. Viator testified that he had his rear emergency visual signals activated when Cotton passed in the closest lane of traffic, and that Cotton did not vacate the lane or slow to below 70 miles per hour, in violation of Texas Transportation Code § 545.157.

Cotton, on the other hand, testified that Lt. Viator's emergency vehicle was parked in front and perpendicular to the abandoned vehicle, such that the rear of the emergency vehicle (i.e., the flashing emergency lights) was pointed at a 90 degree angle *away* from oncoming traffic. The transcript of the videotape reports the following exchange between Lt. Viator and Cotton:

> VIATOR: OKAY. YOU UH, DIDN'T NOTICE ME FINISHING UP TAGGING THAT VEHICLE BACK THERE?
>
> COTTON: NO. YOU KNOW WHAT IT WAS? I JUST ASKED MY FRIEND, TOO. WHEN WE WAS RIDING, RIGHT?
>
> VIATOR: YEAH.
>
> COTTON: I SAW A CAR PULLED OVER THERE AND NO, USUALLY THE POLICE ARE BEHIND THE CAR.
>
> VIATOR: RIGHT.
>
> COTTON: AND HE SAID TO ME, HE SAID WHEN I WENT AROUND, I SAID

>    THE POLICE ARE IN FRONT OF THE CAR.
>
>    VIATOR: UH, HUH.
>
>    COTTON: AND HE SAID, YEAH. YOU SHOULD HAVE GOT IN THE OTHER LANE.
>
>    VIATOR: YEAH.
>
>    COTTON: I SAID, I KNOW. BUT I DIDN'T SEE THE POLICE IN FRONT OF THE CAR. USUALLY WHEN THE POLICE GOT A CAR, HE'S BEHIND IT. AND THEN HE SAID THAT VEHICLE WAS PROBABLY ABANDONED. THAT'S PROBABLY WHY HE WAS IN FRONT OF IT. [UNINTELLIGIBLE]…
>
>    VIATOR: YOU NOTICE THAT ORANGE STICKER ON THE BACK OF IT, IT'S AN ABANDONED VEHICLE.
>
>    COTTON: RIGHT.
>
>    VIATOR: I WAS JUST CHECKING IT…
>
>    COTTON: I JUST DIDN'T NOTICE IT.
>
>    VIATOR: TO MAKE SURE IT WAS SECURE.
>
>    COTTON: JUST DIDN'T NOTICE IT.

Dkt. 39, Ex. 2, pg. 2.

Cotton argues that the transcript (specifically his statement "But I didn't see the police in front of the car. Usually when the police got a car, he's behind it.") supports his hearing testimony that the emergency vehicle was parked in front of the abandoned vehicle, such that the emergency lights were not visible prior to his passing of the abandoned vehicle. Although unclear, Cotton's argument as alleged in his written motion seems to be that Lt. Viator's stop of his vehicle was based not on reasonable suspicion of a traffic violation but based upon his race, thus constituting an impermissible stop.

The court does not find Cotton's argument persuasive. The traffic violation that Cotton allegedly violated has no *mens rea* requirement. Therefore, the issue as to whether Cotton *actually saw* the lights (and therefore *deliberately* committed a traffic violation) is irrelevant - the pivotal issue is whether Lt. Viator reasonably believed Cotton committed a traffic violation. Lt. Viator is a seasoned police officer and testified that he personally witnessed Cotton violate Texas Transportation Code 545.157. Accordingly, he had probable cause to stop the vehicle. See Whren, 517 U.S. at 819, 116 S.Ct. At 1777; United States v. Felix, 2009 WL 1508207 (N.D. Tex. 2010).

### C. Facts of the detention

Once the Defendant had pulled his vehicle to the side of Interstate 10, Lt. Viator approached the passenger side of the vehicle and retrieved Cotton's identification. Soon thereafter, Lt. Viator asked Cotton to step to the back of the Grand Marquis. When Lt. Viator asked about his travels, Cotton said he and Thornton were coming from Houston and had gone to visit Thornton's "sick Aunt Helen." He also said they had stayed in Houston for "two or three days." When asked about the sick aunt's condition, Cotton said she had "high blood pressure" and her "feet were swelling up." When Lt. Viator asked if the aunt was in the hospital, Cotton said, "No, [Thornton] was just concerned about it." After questioning Cotton independently, Lt. Viator stepped to the passenger-side window to ask the same questions to Thornton. When Lt. Viator questioned Thornton about their travels, Thornton said they had gone to visit his Aunt Helen who was "very sick" with cancer and was deteriorating rapidly. Thornton said they had come to see her two days ago, stayed with her for a day and a half and then went to stay in a Motel 6. Thornton said he and Cotton had flown down to Houston to visit Aunt Helen, but were driving the rental car back home to Atlanta because they had both run out of money and could not afford a plane ticket. Lt. Viator inquired whether the aunt was

in the hospital, and Thornton replied that she was in hospice care. Lt. Viator then pointed out that the vehicle was scheduled to be returned to Houston and was not a one-way rental, however Thornton asserted that they intended to return the vehicle in Atlanta.

Lt. Viator then returned to speak with Cotton, and asked him how he traveled to Houston. Cotton stated that he *drove* Thornton in his Range Rover, however, the Range Rover broke down in Houston *several months ago* and he did not have money to have the car repaired. Lt. Viator then asked Cotton if they had stayed at Thornton's aunt's house while in Houston, to which Cotton responded they had stayed in a hotel. When asked about the rental car return, Cotton stated that he intended to return the car in Atlanta.

Next, Lt. Viator informed Cotton that his job was to look for illegal weapons and contraband, and requested permission to search the vehicle. Upon receiving what he purported to be consent (which Cotton disputes), Lt. Viator initiated a search of the entire vehicle. Lt. Viator first searched the passenger-side of the vehicle, moving clockwise to the trunk and later to the driver's side doors. While searching the vehicle, dispatch returned the criminal history on Cotton, which included a prior charge for possession of cocaine in El Paso, Texas.

Lt. Viator testified that as he began inspecting the vehicle doors on the rear driver's side, he noticed that the screw holding the door panel in place had been loosened and there were tool marks around the screw. Lt. Viator loosened some additional screws on the door panel, pulled the plastic back in order to look inside the door, and observed a small bundle wrapped in cellophane.

At this time, Lt. Viator signaled (with a hand gesture) for Dep. Landry (who had subsequently appeared at the traffic stop to provide assistance) to place Cotton in handcuffs. As Dep. Landry walked towards Cotton, Cotton attempted to flee by running down the service road. After a short

chase on foot, Cotton was placed in custody and brought back to the vehicle. Before the bundle could be removed from the door, Cotton stated that he wanted to talk with Lt. Viator. Cotton was promptly informed of his constitutional rights.

Officers moved the vehicle away from the road in order to conduct a safer removal of the bundle. Once the package was removed, officers observed it to be a ziplocked bag wrapped in clear cellophane. Lt. Viator cut into the package and found it to contain a substance that he recognized as crack cocaine. The suspected narcotics were later tested and were confirmed to be approximately 494.9 grams of crack cocaine. Cotton was subsequently indicted by Federal Grand Jury on March 2, 2011 for possession with the intent to distribute over 280 grams of crack cocaine.

### D.    **Legal analysis of the detention**

The second prong of the Terry analysis requires that the detention last no longer than required to effectuate the purpose of the stop - the purpose of the stop in the instant case being a violation of a misdemeanor traffic violation. See United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005) (quoting Brigham, 382 F.3d at 507 (5th Cir. 2005)).

The Defendant claims that his "secondary detention was the result of an unlawful and overreaching search, which exceeded the scope of both the alleged purpose of the stop as well as the scope of consent given by Cotton, and lacked the required reasonable suspicion and probable cause for the seizure making the continued detention unreasonable and, consequently, unlawful." Dkt. 36, p. 4.

The relevant question in assessing whether a detention extends beyond a reasonable duration is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly. Brigham, 382 F.3d at 511 (quoting United States v. Sharpe, 470 U.S. 675,

686 (1985)). In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Brigham, 382 F.3d at 507. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. These types of questions are acceptable for a traffic stop as long as they do not unnecessarily prolong the detention. The officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id. Moreover, if the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, he may further detain its occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. See id.

Lt. Viator testified that he followed Cotton with his lights flashing for nearly one mile before Cotton pulled over to the shoulder of Interstate 10. The transcript and video depict Lt. Viator questioning Cotton and Thornton separately for the first nine minutes of the stop. Nearly every question asked during these nine minutes related to the purpose or logistics of their travels, with some inquiries as to past criminal history. Questions posed to Cotton include: "What brings you over here?" (Gov. Ex. #2, pg. 3), "How long y'all been in Houston?" Id., "Have you ever been arrested?" (Gov. Ex. #2, pg. 5); questions posed to Thornton include: "What brings ya'll over here?" (Gov. Ex. #2, pg. 6), "Y'all arrived in Houston on what day?" (Gov. Ex. #2, pg. 7), "How did y'all get to Houston?" (Gov. Ex. #2, pg. 8).

Lt. Viator verbally noted that during the course of questioning, Cotton appeared to be nervous and that his hands were shaking. The inconsistencies in the responses given by Cotton and Thornton were significant and obvious, and Lt. Viator found the circumstances of the travel arrangements (i.e.,

that it was a rental with a round-trip arrangement) to be suspicious.[4] Lt. Viator reported Cotton's license to dispatch at approximately 9 ½ minutes into the stop. After approximately twelve minutes into the stop, Lt. Viator received verbal consent from Cotton to search the vehicle (the scope of his consent is disputed and discussed in further detail below). The license and registration information was not returned from dispatch until approximately 17 minutes into the stop (while Lt. Viator was still conducting the search), upon which time Lt. Viator learned that Cotton had a prior charge for possession of over 28 grams of cocaine in El Paso.

Lt. Viator testified that the inconsistent and nervous responses,[5] the suspicious method of travel, and the fact that Cotton drove for nearly one mile before pulling the vehicle to the shoulder all contributed to a reasonable suspicion that criminal activity was afoot.[6] The undersigned agrees. Given the totality of the circumstances, Lt. Viator's questioning exemplified a graduated response to emerging facts, and therefore does not constitute a Fourth Amendment violation. Brigham at 508 & nn. 5-6 ("'[D]etention, not questioning, is the evil at which Terry's second prong is aimed.'") (citation omitted).

---

[4] When asked about his travels, Cotton stated that they came from Georgia, where they lived, to visit Mr. Thornton's sick aunt Helen. However, their accounts of Aunt Helen's illness and condition differed greatly. When asked why the pair had rented a vehicle to drive to Georgia, Mr. Thornton responded that they had run out of money and could not afford a return plane ticket back to Georgia; Cotton, in comparison, responded that he and Mr. Thornton had driven to Houston in a Range Rover. A few minutes later, Cotton contradicted himself and said that his Range Rover had broken down in Houston several months ago.

[5] The undersigned disagrees with Lt. Viator's characterization of Cotton's behavior as nervous. However, this disagreement did not factor in the ultimate determination that the detention was legal.

[6] See, e.g., United States v. Pack, 612 F.3d 341, 361 (5th Cir. 2010) ("Considering the large volume of contraband that is moved along our major highways on a daily basis, especially in border states like Texas, a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers. Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband.")

### E. The search

Cotton further challenges the validity of Lt. Viator's search. He contends that Lt. Viator's search of his vehicle exceeded the scope of consent given, and that the officer lacked the requisite probable cause to conduct the search. Specifically, Cotton argues that he gave Lt. Viator consent to only search his luggage, and that the transcript proffered by the government documenting this exchange as Government's Exhibit #2 is inaccurate. The following is the recorded dialogue between Lt. Viator and Cotton as documented in Government's Exhibit # 2 regarding his consent:

> VIATOR: CAN I SEARCH THIS VEHICLE?
>
> COTTON: **YEAH, YOU CAN SEARCH IT**.
>
> VIATOR: HOLD ON. COME HERE. COME HERE. COME HERE. IS IT OKAY IF I SEARCH IT?
>
> COTTON: SEARCH MY LUGGAGE [UNINTELLIGIBLE].
>
> VIATOR: OKAY. IS IT OKAY IF I SEARCH EVERYTHING IN THE CAR?
>
> COTTON: MY LUGGAGE, YEAH.

Govt. Ex. #2, pg. 14.

In the original transcript produced in this case and marked at the hearing as the Defendant's Exhibit #2, the line noted in bold type was described as "inaudible." Cotton testified that the Government's transcript is incorrect, and what he actually said was, "Yeah, I'll show you."

Before the hearing, Lt. Viator was contacted by the U.S. Attorney's office and asked to view the traffic stop video and clarify missing or inaudible portions of the individuals' statements for preparation of a transcript. At the hearing, Lt. Viator initially testified that he only revised *his personal* statements, but after a lunch break he admitted that he was also allowed to amend Cotton's

comments based on his memory of the events. The Defendant promptly objected to the transcript being admitted, but the undersigned admitted it with the limitation that it would only be used to aid in the determination of what Cotton said - not for the purpose of definitively establishing the exact words spoken.

There is a valid dispute between the parties regarding the scope of consent: whether it extended to the entire vehicle or was limited to Cotton's luggage only. While the intelligible dialogue of the video suggests that consent to search the entire vehicle was given, the undersigned does not need to make a conclusive determination as to what Cotton actually said. Assuming *arguendo* that Cotton's initial consent was limited exclusively to a search of his luggage, the objective reasonableness standard would allow Lt. Viator to look anywhere in the vehicle where the luggage could possibly be found, including the back seat of the car and floor boards.[7] Lt. Viator testified that upon examination of the driver-side back seat, he noticed that the door's screws (used to secure the inner plastic molding to an inside metal part of the door) were surrounded by tool marks which suggested that the screws had been loosened. Lt. Viator further testified that once he saw the loose screw and tool markings, he established probable cause to search the interior of the door panel.[8]

---

[7]  The Supreme Court has instructed us on the standard for determining the scope of consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness . . . ." Florida v. Jimeno, 500 U.S. 248, 251 (1991). The key inquiry focuses on what the "typical reasonable person [would] have understood by the exchange between the officer and the suspect." Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 183-84 (1990)). The factual circumstances surrounding the consent may be important in determining the nature of the consent and how a reasonable officer would have understood the consent. Ibarra, 965 F.2d at 1357.

[8]  The Fifth Circuit has held that "evidence of a hidden compartment supports 'probable cause' for a search/arrest . . ." See United States v. Estrada, 459 F.3d 627 (5th Cir. 2006). The Court has also stated that a "hidden compartment includes areas which are "part of the vehicle's design," such as a vehicle firewall." United States v. Banuelos-Romero, 597 F.3d 763, 768 (5th Cir. 2010).

If, as Cotton argues, his intent was to limit the search to his luggage, then he undoubtedly would have interrupted Lt. Viator's search once it expanded the scope of that consent. Lt. Viator's search was slow and methodical, beginning at the front-passenger area of the car and proceeding clockwise to the rear driver-side door where the drugs were ultimately found. Approximately fifty-four minutes passed from the beginning of the stop to the time when Lt. Viator spotted the suspicious bundle, and at no time did Cotton make even the slightest attempt to withdraw consent to search his vehicle. Cotton's allowance of Lt. Viator's search of the entire vehicle, while he stood by and watched, belies his contention that he only gave consent to search the luggage.

Cotton's claim that Lt. Viator lacked probable cause to open the closed and wrapped plastic bundle found in a hidden compartment is similarly without merit. By the time Lt. Viator began to open the wrapped bundle, he had full knowledge of the following: (1) Cotton and his passenger exhibited suspicious behavior as witnessed by an undercover narcotics officer earlier that morning; (2) Lt. Viator followed Cotton and Thornton with his lights flashing for nearly one mile before he pulled over; (3) Cotton exhibited extreme signs of nervousness during questioning; (4) Cotton and his passenger provided inconsistent and suspicious accounts of their travel arrangements, (5) Cotton had a criminal history that included a prior conviction for possession of more than 28 grams of cocaine in El Paso, and (5) Cotton attempted to flee on foot. Furthermore, before Lt. Viator even opened the bundle, Cotton made several admissions about the bundle, including an offer to show the officers "stuff that's bigger than just two people driving a car." Based on a totality of the circumstances, Lt. Viator certainly had probable cause to believe that the bundle contained narcotics.

### F. Cotton's admissions

After Cotton's attempt to flee on foot, Lt. Viator advised Cotton of his *Miranda* rights.

Despite being advised of his right to remain silent, Cotton elected to make a statement to Lt. Viator: ". . . We would like to make a statement to you." Gov. Ex. 2, pg. 21. Cotton raises a general argument that the oral statements made at the scene of the stop were involuntary and coerced, and should therefore be suppressed. However, he does not provide a specific argument that demonstrates how Lt. Viator's *Miranda* warnings were deficient.

Persons under custodial interrogation may waive their Fifth and Sixth Amendment rights – assuming appropriate procedural safeguards have been employed – when they do so knowingly, voluntarily, and intelligently. Miranda v. Arizona, 384 U.S.463, 444 (1966).[9] When that occurs, subsequent statements may be admitted at trial. Missouri v. Seibert, 542 U.S. 600, 608-09 (2004). Giving the warnings and getting a waiver generally produces a *virtual ticket of admissibility*. Id. at 608-09 (italics added).

For a waiver to be voluntary, the decision to waive one's Miranda rights must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." United States v. Cardenas, 410 F.3d 287, 293 (5th Cir. 2005). Determination of voluntariness is based on the totality of circumstances, and is made on a case-by-case basis. Id. "Absent evidence that [a suspect's] 'will was overborne and his capacity for self-determination critically impaired' because of coercive police conduct, his waiver . . . was voluntary." Colorado v. Spring, 479 U.S. 564, 574 (1987). In addition, the waiver must have been made with an awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it (the knowing and intelligent requirement). Id. "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding

---

[9] See also, Patterson v. Illinois, 487 U.S. 285, 292-93, 296-97 (holding that once Sixth Amendment right to counsel attaches, valid waiver of Miranda rights is also a valid waiver of Sixth Amendment right to counsel).

that case, including the background, experience, and conduct of the accused.'" North Carolina v. Butler, 441 U.S. 369, 374 (1979) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))

The dialogue between Lt. Viator and Cotton during the traffic stop unequivocally shows that Cotton's statements were self-initiated, voluntarily made, and after he was properly informed of his constitutional rights. Accordingly, the undersigned finds that these statements should not be suppressed.

### E. Silver Platter Doctrine

Cotton asserts that the seizure of the narcotics was a flagrant abuse of the law by state officials and asks the Court to exercise its supervisory power to exclude evidence, citing to United States v. Thomas, 787 F.Supp. 663, 672 (E.D. Tex. 1992) and United States v. Eastland, 989 F.2d 760. Merely citing to these cases, however, does nothing to support Cotton's argument because he has wholly failed to show how the search and seizure at issue violated the Fourth Amendment.

### III. RECOMMENDATION

The district court should find that the stop and subsequent search of Cotton's vehicle was within the constitutional parameters of Rule 41(f) of the Federal Rules of Criminal Procedure and the Fourth, Fifth, and Sixth Amendments to the United States Constitution. Accordingly, the Defendant's motion to suppress should be denied.

### IV. OBJECTIONS

Objections must be: (1) specific, (2) in writing, and (3) served and filed within fourteen (14) days after being served with a copy of this report. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b), and 72(b). A party's failure to object bars that party from: (1) entitlement to de novo review by a district judge of proposed findings and recommendations, see Rodriguez v. Bowen, 857 F.2d

275, 276-77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error of unobjected-to factual findings and legal conclusions accepted by the district court, see Douglass v. United Servs. Auto. Ass'n., 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. See Hernandez v. Estelle, 711 F.2d 619, 620 (5th Cir. 1983); United States v. Elsoffer, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

SIGNED this 7th day of November, 2011.

_____
Zack Hawthorn
United States Magistrate Judge